648 A.2d 705

STEVEN CIVALIER, A MINOR BY HIS GUARDIAN AD LITEM, JOHN R. CIVALIER, JOHN R. CIVALIER, INDIVIDUALLY AND MARIO DIANORA, EXECUTOR OF THE ESTATE OF GENEVIEVE DIANORA AND/OR MARIO DIANORA, ADMINISTRATOR AD PROSEQUENDUM AND GENERAL ADMINISTRATOR OF THE ESTATE OF BARBARA CIVALIER, PLAINTIFFS–APPELLANTS, v. THE ESTATE OF MARGARET J. TRANCUCCI, DOMINICK R. TRANCUCCI, WAWA, INC., AND J. HEWITT & SONS, DEFENDANTS–APPELLANTS, AND TOWNSHIP OF WASHINGTON, WASHINGTON TOWNSHIP POLICE DEPARTMENT, COUNTY OF GLOUCESTER, DEFENDANTS–RESPONDENTS.

ANTHONY F. PREVITE, GLOUCESTER COUNTY HIGHWAY DEPARTMENT, AND/OR THE STATE OF NEW JERSEY JOINTLY, SEVERALLY, AND/OR IN THE ALTERNATIVE, DEFENDANTS.

CARLO P. TRANCUCCI, AS GENERAL ADMINISTRATOR AND ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF MARGARET J. TRANCUCCI; AND CARLO P. TRANCUCCI, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. WASHINGTON TOWNSHIP, N.J.; WASHINGTON TOWNSHIP POLICE DEPARTMENT; GLOUCESTER COUNTY, N.J., DEFENDANTS–RESPONDENTS, AND WAWA, INC., AND J. HEWITT & SONS, DEFENDANTS–APPELLANTS, AND ANTHONY F. PREVITE;

JESSE HEWITT, ABC COMPANY, A FICTITIOUS BUSINESS ENTITY WHOSE IDENTITY IS CURRENTLY UNKNOWN; XYZ COMPANY, A FICTITIOUS BUSINESS ENTITY WHOSE IDENTITY IS CURRENTLY UNKNOWN; AND JOHN DOE 1 THROUGH 10, FICTITIOUS PERSONS WHOSE IDENTITIES ARE CURRENTLY UNKNOWN, DEFENDANTS.

ANTHONY F. PREVITE AND FLORENCE A. PREVITE, HUSBAND AND WIFE, PLAINTIFFS–APPELLANTS, v. THE ESTATE OF MARGARET J. TRANCUCCI, DOMINICK R. TRANCUCCI, WAWA, INC., J. HEWITT & SONS, WASHINGTON TOWNSHIP POLICE DEPARTMENT, DEFENDANTS–APPELLANTS, AND COUNTY OF GLOUCESTER AND TOWNSHIP OF WASHINGTON, DEFENDANTS–RESPONDENTS, AND STATE OF NEW JERSEY, DEFENDANT.

INTERESTED UNDERWRITERS AT LLOYDS AS ASSIGNEES OF ANTHONY F. PREVITE, PLAINTIFF, v. DOMINICK TRANCUCCI AND DOMINICK TRANCUCCI, AS ADMINISTRATOR OF THE ESTATE OF MARGARET TRANCUCCI, DEFENDANTS AND THIRD–PARTY PLAINTIFFS–APPELLANTS, v. WAWA, INC., MILLVILLE MANUFACTURING CO., T/A WAWA, J. HEWITT & SONS, THIRD–PARTY DEFENDANTS–APPELLANTS, AND COUNTY OF GLOUCESTER, WASHINGTON TOWNSHIP, WASHINGTON TOWNSHIP POLICE DEPARTMENT, THIRD–PARTY DEFENDANTS–RESPONDENTS, AND JOHN DOES (1–100), FICTITIOUS NAMES, THIRD–PARTY DEFENDANTS.

Argued May 2, 1994—Decided October 20, 1994.

*Richard S. Ranieri* argued the cause for appellant Wawa, Inc. (*Callahan, Delany & O'Brien,* attorneys; *Glenn P. Callahan,* of counsel).

*John L. Slimm* argued the cause for respondent Washington Township Police Department (*Slimm & Goldberg,* attorneys; *Peter S. Cuddihy,* on the brief).

*Talbot B. Kramer* argued the cause for respondent Township of Washington (*Bernadette A. Duncan,* attorney).

*Lawrence Berg* argued the cause for respondent County of Gloucester (*Marshall, Dennehey, Warner, Coleman and Goggin,* attorneys).

*Bertram P. Goltz, Jr.,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General, attorney; *Joseph L. Yannotti, Jr.,* Assistant Attorney General, of counsel).

*Barry J. Hockfield,* for appellants Steven Civalier, a minor by his guardian ad litem, John R. Civalier; John R. Civalier, Individually; and Mario Dianora, Executor of the Estate of Genevieve Dianora and/or Mario Dianora, Administrator ad prosequendum and General Administrator of the Estate of Barbara Civalier, was granted leave to rely on the briefs and argument on behalf of appellant Wawa, Inc. (*Hockfield, Hasner, Weiss & Rosenberg,* attorneys).

*Vincent P. Sarubbi,* for appellants Anthony F. Previte and Florence A. Previte, husband and wife, was granted leave to rely on the briefs and argument on behalf of appellant Wawa, Inc. (*Sarubbi & Sarubbi,* attorneys).

*Charles R. Cohen,* for appellant Carlo P. Trancucci, as General Administrator and Administrator Ad Prosequéndum of the Estate of Margaret J. Trancucci; and Carlo P. Trancucci, Individually, was granted leave to rely on the briefs and argument on behalf of appellant Wawa, Inc. (*Pearl, Levy & Cohen,* attorneys).

*Burchard S. Martin,* for appellant Estate of Margaret Trancucci, was granted leave to rely on the briefs and argument on behalf of appellant Wawa, Inc. (*Martin, Gunn & Martin,* attorneys).

*Michael K. Tuzzio,* for appellant J. Hewitt & Sons, was granted leave to rely on the briefs and argument on behalf of appellant Wawa, Inc. (*Donington, Karcher, Salmond, Ronan & Rainone,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

At issue in this case is the liability of public-entity defendants, Gloucester County, Washington Township, and the Washington Township Police Department, for an automobile accident allegedly caused by a missing traffic sign. Three people lost their lives in the accident.

I

Because the case arises on summary judgment, all inferences of fact must be drawn in favor of those parties opposing the motion. Pretrial discovery discloses the following. Margaret Trancucci was driving an automobile west on Mariner Drive, a municipal road in Washington Township, New Jersey, in the early evening of November 30, 1989. Anthony Previte was driving a panel truck south on Pitman–Downer Road, a county road. A stop sign was ordinarily posted at the northeast corner of the intersection of the two roads, facing east on Mariner Drive. Previte knew that a sign

regulated the intersection and he assumed that he had the right of way. However, at the time of the accident, the sign was missing, leaving only a bare pole. The sign had been reported missing earlier in November and Washington Township had replaced it. Between the time of that replacement and the accident, the sign had been removed again. The Chief of the Washington Township Police Department acknowledged that vandalism of stop signs is a recurring problem for the community.

A Wawa convenience store is located on the same northeast corner of the intersection. Overgrown shrubbery on that corner obscured visibility of southbound traffic on Pitman–Downer Road. An eyewitness estimated the speed of Previte's truck to be forty-five miles per hour and the speed of Trancucci's car to be five miles per hour as she entered the intersection. When Trancucci reached the center of the intersection, she apparently noticed Previte's oncoming truck and accelerated in an unsuccessful effort to avoid being hit by the truck.

As a result of the accident, Trancucci and her two adult passengers, Genevieve Dianora and Barbara Civalier, died. Ten-year-old Steven Civalier, another passenger in Trancucci's car, and Anthony Previte were injured. These suits variously charge the drivers, the convenience store, the store's landscape contractors, and the public entities with causing the accident. The three public entities filed motions for summary judgment on the basis that *N.J.S.A.* 59:4–5 grants them immunity from liability for "failure to provide ordinary traffic signals, signs, markings or other similar devices."

The trial court granted those motions, holding that the asserted dangerous condition of property arose from the absence of an ordinary traffic signal, a condition for which *N.J.S.A.* 59:4–5 specifically grants public entities immunity. The court concluded that the intersection did not constitute a "dangerous condition" of public property for purposes of liability under either *N.J.S.A.* 59:4–2 or *N.J.S.A.* 59:4–4 (requiring emergency warning of dangerous conditions that are not apparent) because, when the sign was removed, the intersection became an ordinary "uncontrolled

intersection" under *N.J.S.A.* 39:4–90, and the regulations promulgated under that statute dictated the appropriate conduct of drivers approaching the intersection. The court thus reasoned that an uncontrolled intersection is not an unusual, extraordinary, or unexpected occurrence or condition calling for immediate action under *N.J.S.A.* 59:4–5. The Appellate Division denied leave to appeal that ruling. We granted leave to appeal, 134 *N.J.* 556, 557, 636 *A.*2d 516 (1993).

## II

In a recent series of cases, we have considered the proper relationship between the liability and immunity provisions of the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to :12–3 (the Act). For example, in *Weiss v. New Jersey Transit,* 128 *N.J.* 376, 608 *A.*2d 254 (1992), we faced an issue similar to that currently before us. In that case, a driver's car was struck by a train at an uncontrolled railroad grade crossing. A traffic signal had long been planned for the grade crossing, but a "tortuous history of bureaucratic red-tape," 245 *N.J.Super.* 265, 270, 584 *A.*2d 1359 (App.Div.1991), delayed its operation. Plaintiffs in *Weiss* claimed that the legislative grant of immunity for failure to place a traffic signal under *N.J.S.A.* 59:4–5 did not apply because the true cause of the dangerous condition was not the absence of the traffic signal but rather the independent negligence of the public bodies in delaying the installation of the traffic signal.

We did not agree. We believed that the denial of immunity to a public entity on the basis of administrative negligence in implementing a plan to post a traffic signal would result in there being "little left to the immunities granted by the Act." 128 *N.J.* at 380. We recognized the closeness of the call, but we believed that the liability provisions of the Act could not take precedence over specifically-granted immunities. Our precedent supported that conclusion. In *Bombace v. City of Newark,* 125 *N.J.* 361, 593 *A.*2d 335 (1991), we had held that the ordinary negligence of a municipal official in terminating a legal proceeding to prosecute housing

violations did not diminish the explicit grant of immunity contained in the Act for failure to enforce the law. In *Pico v. State*, 116 *N.J.* 55, 560 *A.*2d 1193 (1989), we had held that the express immunity for weather conditions under *N.J.S.A.* 59:4–7 barred suit against the State for any negligent delay in dispatching the road sanders to clear up icy roads. In short, we recognize that "[w]e have been adjured by the framers of the Tort Claims Act that we should approach these cases from the perspective that immunity is the dominant theme of the Act. * * * [When] an immunity applies, liability does not attach." *Weiss, supra,* 128 *N.J.* at 383, 608 *A.*2d 254.

■ Although this accident might not have happened had the public bodies used "vandal-proof" bolts to make removal of the sign much more difficult, were we to recognize the failure to affix properly an ordinary traffic signal as a basis for government liability, we would be logically compelled to recognize liability for failure to post promptly a traffic signal as well. We do not believe that the Legislature intended such liability. *See Kolitch v. Linde-dahl,* 100 *N.J.* 485, 496, 497 *A.*2d 183 (1985) ("[B]oth the decision [to post a sign] and the act of implementation are one and the same for the purposes of the [traffic sign immunity]."). Were that issue (improper posting of the sign) the only issue, we would affirm.

### III

#### A.

■ One fact, however, distinguishes this case from *Weiss* and *Kolitch.* As the driver to the right at an uncontrolled intersection, Previte had the right of way, *N.J.S.A.* 39:4–90. In addition, he believed that he was entering a *controlled* intersection that provided him the right of way. Although *N.J.S.A.* 59:4–5 explicitly grants public entities immunity from liability "for an injury caused by the failure to provide ordinary traffic signals, signs, markings or other similar devices," an exception to the immunity provisions

of the Act allows public entities to be held liable for injuries caused by their failure to provide emergency warning signals:

> Subject to section 59:4-2 of this act, a public entity shall be liable for injury proximately caused by its failure to provide *emergency* signals, signs, markings or other devices if such devices were necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care.
>
> [*N.J.S.A.* 59:4-4 (emphasis added).]

How does the foregoing provision relate to the immunity for failure to provide ordinary traffic signals under *N.J.S.A.* 59:4-5? *Spin Co. v. Maryland Casualty Co.*, 136 *N.J.Super.* 520, 524, 347 *A.*2d 20 (Law Div.1975) (finding no emergency in failure to post height of bridge), explains that "in enacting *N.J.S.A.* 59:4-4 and 5, * * * the Legislature intended to codify pre-existing case law . * * *." The comment to the sections indicates that those sections codified *Hoy v. Capelli*, 48 *N.J.* 81, 222 *A.*2d 649 (1966), and *Bergen v. Koppenal*, 52 *N.J.* 478, 246 *A.*2d 442 (1968). See *N.J.S.A.* 59:4-5 comment (stating that "[t]his section is consistent with existing New Jersey law," and citing *Hoy* ); *N.J.S.A.* 59:4-4 comment (stating that provision imposes liability "for the failure on the part of a public entity to provide an emergency warning signal or device when a condition exists constituting a 'trap' to a person using a street or highway with due care," and citing *Bergen* ).

In *Hoy, supra,* 48 *N.J.* 81, 222 *A.*2d 649, the City of Wildwood removed a defective traffic light that needed to be replaced. The City took no further action to ensure that the intersection, which had been regulated by two stop signs prior to the initial installation of the traffic light, remained safe while the traffic light was down. As a result, a collision occurred. The Court held that the common law furnished the City with immunity from liability for the accident because "the sole traffic light at the intersection had been completely removed for almost two months and there [was] not the slightest suggestion that either driver relied on the fact that it or any other traffic regulation device had existed." *Id.* at 86, 222 *A.*2d 649.

On the other hand, in *Bergen, supra,* 52 *N.J.* 478, 246 *A.*2d 442, this Court allowed a jury to consider public-entity liability for failure to take remedial action after a broken cable caused a traffic light to turn and become misdirected. The Court identified the issue as "whether for tort purposes the Township was * * * under a duty to take over traffic control when its officer learned of the situation * * *." *Id.* at 480, 246 *A.*2d 442. It held that "a duty may be found if a police officer learns of an emergent road condition which is likely not to be observed by a motorist and which holds an unusual risk of injury." *Ibid.*

The facts of our case differ from the facts of *Hoy* in that the truck driver, Previte, was relying on the existence of a stop sign on the municipal road as he drove down the county road, whereas the drivers in *Hoy* were not relying on the existence of any traffic signal. Thus, because the Court qualified its ruling in *Hoy* by emphasizing the absence of reliance by either driver, the codification of *Hoy* does not automatically bar suit against the public bodies in this case.

### B.

New Jersey patterned its Tort Claims Act largely on the California Tort Claims Act. *Tice v. Cramer,* 133 *N.J.* 347, 361, 627 *A.*2d 1090 (1993). In its May 1972 report to the New Jersey Legislature, the Attorney General's Task Force on Sovereign Immunity gave a paragraph-by-paragraph summary of the proto-type California Tort Claims Act of 1963. The California act has similar interrelated provisions granting immunity for "failure to provide" traffic signals but imposing liability for "failure to warn" of dangerous conditions not readily apparent to the public.

The text of the two California provisions as they existed in 1972 read as follows:

§ 830.4 [Traffic control signs, roadway markings].

A condition is not a dangerous condition within the meaning of this chapter merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the

Vehicle Code, or distinctive roadway markings as described in Section 21460 of the Vehicle Code.

[*Cal.Gov't Code* § 830.4.]

§ 830.8 [Failure to provide traffic or warning signals, markings, etc.]

Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code. Nothing in this section exonerates a public entity or public employee from liability for injury proximately caused by such failure if a signal, sign, marking or device (other than one described in Section 830.4) was necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care.

[*Cal.Gov't Code* § 830.8.]

The approved California Law Revision Commission Comment to that section stated:

This section prevents the imposition of liability based on the failure to provide traffic regulatory or warning signals or devices of a type not listed in Section 830.4 but liability may exist for failure to provide such a signal or device where the condition constitutes a trap to a person using the street or highway with due care.

[As cited in Arvo Van Alstyne, *California Government Tort Liability* 558 (1964).]

A New Jersey legislator seeking to understand the meaning of these prototype provisions would have been drawn to Arvo Van Alstyne's definitive treatise, *California Government Tort Liability, supra.* In explaining the meaning of Section 830.4, Professor Van Alstyne wrote:

The purpose of this limitation of the meaning of "dangerous condition" is directly related to the discretionary nature of the subject matter. As the California Law Revision Commission pointed out (RECOMMENDATION RELATING TO SOVEREIGN IMMUNITY 823):

Whether or not to install regulatory traffic devices in particular locations requires an evaluation of a large variety of technical data and policy criteria, including traffic volume frequency and peak load factors, physical layout and terrain, visibility hazards and obstructions, prevailing weather conditions, nature of vehicular use, normal traffic speed in the area, volume of pedestrian traffic, alignment and curvature, need for similar precautionary measures at other like places, alternative methods of control, and availability of funds to do the job. Decisions not to adopt control devices, when based on premises of this order, do not appear to be readily susceptible to intelligent and rational reexamination by untrained juries or judges sitting as triers of fact.

[*Id.* at 197.]

Hence, Professor Van Alstyne noted that the Section 830.4 granting of immunity for failure to provide certain regulatory devices is

limited to a "failure to provide," and does not affect liability based on a failure to maintain regulatory devices, stop signs, and roadway markings, when this failure causes the road or intersection to become dangerous. Under the Public Liability Act, when motorists were entitled to rely on regulatory devices, the failure to keep the devices working properly and unobscured was held actionable. *Dudum v City of San Mateo* (1959) 167 CA2d 593, 334 P2d 968 (stop sign obscured by foliage); *Bady v Detwiler* (1954) 127 CA2d 321, 273 P2d 941 (defective traffic light indicating "Go" in both directions); *Irvin v Padelford* (1954) 127 CA2d 135, 273 P2d 539 (stop sign temporarily removed during repairs); *Rose v County of Orange* (1949) 94 CA2d 688, 211 P2d 45 (stop sign knocked down and not replaced). Of course, if the malfunctioning of the regulatory device did not make the street dangerous to traffic, no liability was imposed. Cf. *Goodman v Raposa,* [ (1957) 151 *Cal.App.*2d 830, 312 *P.*2d 65] *supra* (fact that traffic light not working did not furnish basis of liability, where vehicles on main boulevard were protected from side street traffic by boulevard stop signs).

[*Id.* at 198.]

The New Jersey Act does not, as California's does, draw a dichotomy between regulatory signs (such as stop signs, stop lights, and double lines) and warning devices (such as "curve ahead" and "road narrows"). Instead, the New Jersey Act compresses the concepts into a single mold, grants immunity for failure to provide ordinary traffic signals, *N.J.S.A.* 59:4–5, but imposes liability for failure to provide warning signs when "necessary to warn of a dangerous condition which endanger[s] the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care." *N.J.S.A.* 59:4–4.

The reasoning in *Hoy, supra,* and *Bergen, supra,* both accepted by the official commentary of the New Jersey Act, appears to be the same as that under California law. When motorists are entitled to rely on regulatory devices, failure to keep the devices working properly is actionable unless the malfunctioning of the regulatory device does not make the street dangerous to traffic. *Rose, supra,* 211 *P.*2d 45, is almost on all fours with this case. In that case, cited in Van Alstyne, *supra,* at 198, as consistent with the analogous California Code provision dealing with failure to

provide stop signs, a preexisting stop sign had been taken down when city workers took down a light pole to repair wiring. "Liability [for the missing stop sign in *Rose* ] was based on the fact that its total absence, when a driver on the through street was entitled to rely on its protective presence, created a dangerous condition of public property." *Dudum, supra,* 334 *P*.2d at 971.

How do we assess whether, under the New Jersey Act, a "trap" for motorists has been created? One court has suggested an analysis:

In *Bergen* * * *, the malfunction in the signal was actively deceptive: a green light appeared at both junctions of the intersection. A jury could reasonably infer that the light was a cause of the accident, as each person approaching the intersection was, in effect, lulled into a false sense of security by the green light in his favor. [*Lytle v. City of Newark,* 166 *N.J.Super.* 191, 196 [399 *A*.2d 333] (Law Div.1979) (holding public entity immune when both drivers could plainly see that traffic light was not functioning).]

The question is whether the absence of a traffic signal that had been at the intersection "was actively deceptive" or "lulled [at least one of the drivers] into a false sense of security," thus constituting a "trap" under *N.J.S.A.* 59:4–4.

## IV

 Consistent with the California understanding and prior case law, we hold, in this context of previously-posted traffic signals, that our "trap liability" provision, *N.J.S.A.* 59:4–4, limits recovery to those plaintiffs injured by motorists' reliance on the proper functioning or presence of a previously posted signal to their detriment. We limit the imposition of liability in that way because in the absence of reliance the public entity and the public are in the same position as they were before the entity posted the sign. In that setting of non-reliance, as we held in *Weiss, supra,* 128 *N.J.* 376, 608 *A*.2d 254, public entities have the same immunity for failure to implement promptly a decision to post a sign as they have for their initial discretionary decision not to post a sign at all. However, the element of a driver's reliance on the sign's presence may create a dangerous condition of property for purposes of *N.J.S.A.* 59:4–4 when the signal is malfunctioning or absent.

Therefore, we hold that a public entity is liable for its failure to replace a traffic sign only when the motorist's reliance on the previous presence of the sign caused the claimant's injuries.

In *Eason v. New Jersey Automobile Full Insurance Underwriting Ass'n*, 274 *N.J.Super.* 364, 644 *A*.2d 142 (App.Div.1994), the court held that a driver who had relied on the presence of a stop sign could assert a claim under *N.J.S.A.* 59:4–4:

> After the municipality has both determined by ordinance to place, and has actually installed the traffic sign, its temporary absence could also be considered an emergency requiring the municipality to act, and for which the municipality has no immunity. *N.J.S.A.* 59:4–4.
>
> [*Id.* at 374, 644 *A*.2d 142.]

Similarly, in *Shuttleworth v. Conti Construction Co., Inc.*, 193 *N.J.Super.* 469, 475 *A*.2d 48 (App.Div.1984), the court held that those injured by a motorist who went through a stop sign obscured by a bush had a cause of action against the county:

> Whether we view this case as one challenging the manner in which the sign was originally placed given the sight lines along [the road], or the manner in which the sign was maintained and the bushes trimmed (the offending bush, * * * was on county property), the challenge is to the creation or maintenance of a dangerous condition after the discretionary activity had been taken by the county.
>
> [*Id.* at 472–73, 475 *A*.2d 48.]

*Smith v. State Department of Transportation*, 247 *N.J.Super.* 62, 588 *A*.2d 854 (App.Div.1991), *certif. denied*, 130 *N.J.* 13, 611 *A*.2d 651 (1992), differs from *Eason* and *Shuttleworth*. In *Smith*, only a sign on an overpass indicated the height of the underpass beneath it. The absence of an earlier warning caused a tractor-trailer that was too high to pass through the underpass to back up toward an exit, thus obstructing the roadway and creating a hazard. The court held that "because there is immunity for not posting a sign initially and for where the sign is placed, immunity also exists for not replacing a missing sign." *Id.* at 69, 588 *A*.2d 854. However, the circumstances of *Smith* did not suggest the existence of a "trap." The truck driver in that case never knew of the existence of the earlier sign; therefore, that sign's absence did not lull the driver into a false sense of security. Moreover, although it makes good sense to do so, there is no duty to post the

height of a bridge. *Spin, supra,* 136 *N.J.Super.* 520, 347 *A.*2d 20. Drivers can see that for themselves.

> In *Weiss, supra,* 128 *N.J.* 376, 608 *A.*2d 254, we noted that [w]ere there any other triable issue of independent negligence—for example, had the underbrush that obscured visibility at the crossing been on defendants' property and subject to their maintenance, or had there been any other condition of the property that caused the dangerous condition to exist, *e.g.,* a pothole of long duration, an oil spill on the roadway, or a *broken traffic light,* the complaint might have stated a cause of action.
>
> [*Id.* at 382, 608 *A.*2d 254 (emphasis added) (citation omitted).]

In a sense, we have here a broken traffic signal. Like the misdirected light in *Bergen, supra,* 52 *N.J.* 478, 246 *A.*2d 442, the conditions here lulled Previte into a false sense of security. This case, then, unlike *Weiss,* does present a "triable issue of independent negligence," namely, whether, if it is shown that the public-entity defendants had actual or constructive notice that the stop sign had disappeared, their failure to take remedial action was "palpably unreasonable." Whereas *Weiss* concerned the initial implementation of the discretionary decision to place a traffic signal at a railroad crossing, for which *N.J.S.A.* 59:4–5 clearly immunizes public entities, *see Kolitch, supra,* 100 *N.J.* at 496, 497 *A.*2d 183, this case concerns a failure to replace a traffic sign after the motoring public had come to rely on it.

## V

To sum up, we agree with our dissenting colleagues that taken alone the immunity language of *N.J.S.A.* 59:4–5 might very well support a conclusion that no liability exists in this case. After all, one's first tendency is to conclude, *post* at 72, 648 *A.*2d at 716, that "the true culprit" is the public body's "failure to provide" a stop sign at the intersection. But further analysis suggests that the "true culprit" is not the absence of the stop sign but the go-ahead signal previously given to motorists in the through way.

In its single-dimensional focus on *N.J.S.A.* 59:4–5, the dissent fails to acknowledge and apply the well-settled rules of statutory construction that the Court has followed in interpreting the Tort

Claims Act from its inception. The first rule is that the interpretations of the almost identical act in California, the act on which our Tort Claims Act was patterned, are considered especially persuasive of the intended meaning of the Act as adopted by our Legislature. When the Legislature modeled our law after the California act, it intended, in the absence of other express intent, that we follow the California courts' interpretations of the Act. *Tice, supra,* 133 *N.J.* at 361–62, 627 *A.*2d 1090; *Fuchilla v. Layman,* 109 *N.J.* 319, 331, 537 *A.*2d 652, *cert. denied sub nom. University of Medicine & Dentistry v. Fuchilla,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988). That interpretive rule was based on precisely what the New Jersey Legislature intended, and such interpretations of the Act conform to the legislative intent, not supersede it, as the dissent claims. California decisions on the issue before us have held that no immunity exists. One who is injured because of a reliance on the existence of a stop sign that has been removed and not replaced may recover if all other conditions of liability are met.

Another rule of statutory interpretation that we have regularly followed in construing the Act is that the comments of the New Jersey Attorney General's Task Force that were before the Legislature when it adopted the Tort Claims Act are given not simply deference but something close to binding effect. *Rochinsky v. State Dep't of Transp.,* 110 *N.J.* 399, 407 n. 4, 541 *A.*2d 1029 (1988). The commentary to the relevant sections of the Act makes it equally clear that the Act was intended to adopt the holding of several cases decided prior to the Act itself. That the Legislature intended the Act to be interpreted in accordance with the commentary is not an invention of this Court but a conclusion uniformly supported by drafting history. The cases cited in that commentary make clear to us that one who has relied on a traffic signal that is no longer functioning properly may recover for the municipality's failure to replace it if its absence misdirects traffic. In imposing liability in this matter, the Court is simply doing the will of the Legislature, and doing it in the same way we have done since the Act became law. That only those who are injured

because of a motorist's reliance will recover (whether they are out-of-towners or residents) is simply a consequence of the rule itself, recognized in the cases cited in the commentary and by the courts of California.

■ The dissent is also correct in noting the well-settled rule that immunity is the dominant theme of the Act and that the function of this Court is not to diminish a legislatively intended immunity by inventive judicial interpretation. But this Court also does not function to expand an immunity beyond that intended by the Legislature, to expand it to a point that conflicts with legislative intention as determined by our previously well-settled rules of construction. We do not intend to become, and in the past we have not been, advocates of compensation for injured parties in conflict with the legislative will. We have sustained the legislative immunities in the most tragic settings. See *Levin v. County of Salem*, 133 *N.J.* 35, 626 *A.*2d 1091 (1993) (finding no government liability where man dove from county bridge into shallow tidal waters, suffering paralyzing injury); *Manna v. State*, 129 *N.J.* 341, 609 *A.*2d 757 (1992) (holding public entity immune where motorist killed in accident on a bridge slippery from rain); *Weiss, supra,* 128 *N.J.* 376, 608 *A.*2d 254 (finding governmental entity immune from suit arising from fatal train crash). On the other hand, we cannot deprive injured claimants of just compensation when the Legislature intended that they have a right to seek recovery.

Finally, we recognize the concerns that our dissenting members have expressed about the potential fiscal burdens that our holding may impose on public bodies. The fear is that motorists may feign reliance on the absence of a previously-posted stop sign as an excuse for errant conduct and may seek to hold public bodies liable. Only a fairly sophisticated motorist, however, would know our tort-claims law, and we suspect that most drivers will tell their stories honestly in their initial interviews with police investigators. Courts will detect any later attempt to varnish the truth.

In the twenty-two years since the Tort Claims Act was enacted, very few cases have arisen with a scenario such as this one. We do not anticipate an escalation of such claims. The Legislature has provided a remedy to members of the public injured by "failure on the part of a public entity to provide an emergency warning signal or device when a condition exists constituting a 'trap' to a person using a street or highway with due care." *N.J.S.A.* 59:4–4 comment. But the Legislature has closely limited that remedy by requiring compliance with *N.J.S.A.* 59:4–2, which, among other things, requires a plaintiff to demonstrate that the public entity had actual or constructive notice of the dangerous condition and that the public entity's conduct was "palpably unreasonable." Those requirements are difficult to meet. *See, e.g., DeBonis v. Orange Quarry Co.,* 233 *N.J.Super.* 156, 170–71, 558 *A.*2d 474 (App.Div.1989) (holding that county's general knowledge that stones from quarry would occasionally create dangerous condition on road surface was insufficient to impute to county constructive knowledge of condition of road at time of motorcyclist's accident because condition was dynamic rather than static and was not predictably recurrent). In addition, the Legislature has recognized that public entities cannot be held liable for their discretionary determinations about allocation of limited resources for duties such as road maintenance. *N.J.S.A.* 59:2–3. In short, a regular schedule of maintenance is strong evidence of reasonable conduct.

We vacate the orders of summary judgment in favor of the public entities and remand the matter to the Law Division for further proceedings in accordance with this opinion.

GARIBALDI, J., dissenting.

This Court holds today that *N.J.S.A.* 59:4–5 does not immunize a public entity from liability for an automobile accident caused by a missing "stop" sign. Relying on the driver's "reliance," *ante* at 64, 648 *A.*2d at 712, the Court, however, erroneously converts an ordinary stop sign at an ordinary intersection into an "emergency

signal," creating a "dangerous condition," thereby subjecting public entities to liability. I disagree and would affirm the trial court's summary judgments in favor of defendants Gloucester County, Washington Township, and the Washington Township Police Department.

The majority opinion ignores both the Legislature's clear and unambiguous intent, expressed in the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3 (Act), to favor immunity for public entities, and the plain language of both *N.J.S.A.* 59:4–5 and *N.J.S.A.* 59:4–4. In this era of widespread vandalism and shrinking governmental resources, today's holding also will impose a devastating burden on municipalities, counties, and the State.

## I

The Legislature intended that under the Act a public entity's immunity was to prevail over its potential liability. The Comment to *N.J.S.A.* 59:2–1 makes unmistakably clear that "the basic statutory approach of the New Jersey Tort Claims Act shall be that immunity of all governmental bodies in New Jersey is *reestablished.*" (Emphasis added.) The Comment to Subsection (b), of that statute states: "Subsection (b) is intended to insure that any immunity provisions provided in the act or by common law will prevail over the liability provisions. It is anticipated that the Courts will realistically interpret both the statutory and common law immunities in order to effectuate their intended scope."

We have repeatedly emphasized that "immunity is the dominant theme of the Act" and that where immunity applies, liability does not attach. *Weiss v. New Jersey Transit,* 128 *N.J.* 376, 382–83, 608 *A.2d* 254 (1992); *see Pico v. State,* 116 *N.J.* 55, 560 *A.2d* 1193 (1989); *Rochinsky v. State, Dep't of Transp.,* 110 *N.J.* 399, 541 *A.2d* 1029 (1988); *Kolitch v. Lindedahl,* 100 *N.J.* 485, 492, 497 *A.2d* 183 (1985). Although the majority acknowledges that liability provisions cannot take precedence over specifically-granted immunities, *ante* at 57–60, 648 *A.2d* at 708–09, it departs from that

well-established principle by ignoring the immunity granted public entities under *N.J.S.A.* 59:4–5.

## II

The plain language of *N.J.S.A.* 59:4–5 discloses that the immunity set forth in that statute clearly and unambiguously applies to a public entity's failure to replace a missing stop sign. That statute provides: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide ordinary traffic signals, signs, markings or other similar devices." (Footnote omitted.)

*N.J.S.A.* 59:4–5 has been applied to immunize public entities from liability for failure to provide an ordinary traffic signal or sign in a variety of circumstances. For example, in *Weiss, supra,* 128 *N.J.* at 385, 608 *A.*2d 254, this Court held that the failure of public entities to provide a traffic signal at a railroad crossing in a timely manner was immunized by *N.J.S.A.* 59:4–5. Similarly, in *Kolitch, supra,* 100 *N.J.* at 496, 497 *A.*2d 183, this Court found that the State was not liable for failing to warn motorists of the hazardous nature of a curve on a highway. The Appellate Division has also applied *N.J.S.A.* 59:4–5 on several occasions. See, *e.g., Smith v. State, Dep't of Transp.,* 247 *N.J.Super.* 62, 69, 588 *A.*2d 854 (1991) (holding that Department of Transportation was immune from liability under *N.J.S.A.* 59:4–5 for failing to replace missing sign warning motorists of low overpass), *certif. denied,* 130 *N.J.* 13, 611 *A.*2d 13 (1992); *Johnson v. Township of Southampton,* 157 *N.J.Super.* 518, 525, 385 *A.*2d 260 (holding municipality immune from liability under *N.J.S.A.* 59:4–5 for failure to mark intersection partially obstructed by trees and other vegetation), *certif. denied,* 77 *N.J.* 485, 391 *A.*2d 499 (1978); *Aebi v. Monmouth County Highway Dep't,* 148 *N.J.Super.* 430, 434, 372 *A.*2d 1130 (1977) (holding county immune under *N.J.S.A.* 59:4–5 for failure to warn motorists "that the width of the road way was being suddenly reduced to the width of the bridge").

In applying *N.J.S.A.* 59:4–5, our unifying principle has been "to identify the cause of the accident" and then to ask if that "identified cause or condition is one that the Legislature intended to immunize." *Weiss, supra,* 128 *N.J.* at 380, 608 *A.*2d 254. I agree with the Law Division that the true cause of this accident was the failure to provide an ordinary traffic signal at the intersection. As we stated in *Weiss, supra,* 128 *N.J.* at 385, 608 *A.*2d 254: "When the absence of a traffic signal * * * is the true culprit, government is immune." To hold a public entity liable for its failure promptly to replace an ordinary traffic signal would undermine the Legislature's policy judgment that a public entity should be immune for an injury caused by its failure to provide a stop sign. *See Kolitch, supra,* 100 *N.J.* at 496, 497 *A.*2d 183 ("[B]oth the decision [to post a sign] and the act of implementation are one and the same for the purposes of the [traffic-sign immunity]."); *Smith, supra,* 247 *N.J.Super.* at 69, 588 *A.*2d 854 (holding that "because there is immunity for not posting a sign initially and for where the sign is placed, immunity also exists for not replacing a missing sign"). I agree.

### III

Against the overwhelming evidence that the specifically-granted immunity of *N.J.S.A.* 59:4–5 applies, the majority nevertheless holds that *N.J.S.A.* 59:4–4, a liability provision, prevails. The Court does so by erroneously misinterpreting the plain language of *N.J.S.A.* 59:4–4. That statute provides:

Subject to section 59:4–2 of this act, a public entity shall be liable for injury proximately caused by its failure to provide emergency signals, signs, markings or other devices if such devices were necessary to warn of a dangerous condition which endangered the safe movement of traffic and which would not be reasonably apparent to, and would not have been anticipated by, a person exercising due care.

According to the statute, a public entity is liable only if it fails to provide an "emergency" traffic signal. *N.J.S.A.* 59:4–4 applies only to conditions that are "sudden, unexpected [or] emergent." *Spin Co. v. Maryland Casualty Co.,* 136 *N.J.Super.* 520, 524, 347 *A.*2d 20 (Law Div.1975); *accord Weiss, supra,* 128 *N.J.* at 383–84,

608 *A.*2d 254 (holding *N.J.S.A.* 59:4–4 inapplicable when "the danger [is] endemic, not emergent"). As the Appellate Division correctly stated in *Smith:*

> it would be incongruous indeed to hold that there is immunity for failure to provide ordinary traffic signals under *N.J.S.A.* 59:4–5 but by simply labeling an ordinary, continuing and longstanding traffic condition "an emergency," liability may be created for failing to provide "emergency signals, signs, markings or other devices." An "emergency" means a sudden and unexpected condition, one that is extraordinary.
>
> [247 *N.J.Super.* at 71–72, 588 *A.*2d 854 (footnote omitted).]

An ordinary stop sign does not become an "emergency" signal simply because it once existed but is now absent from an intersection. Because stop signs are "ordinary" traffic signals, no liability may attach to the failure to provide or replace one.

Nor do I believe that the conditions of this intersection at the time of the accident resembled a "trap." See *N.J.S.A.* 59:4–4, comment (stating that statute imposes liability "for the failure on the part of a public entity to provide an emergency warning signal or device when a condition exists constituting a 'trap' to a person using a street or highway with due care"). This is an ordinary intersection in a rural county. Nothing in the record implies that this is a unique intersection. As we stated in *Weiss, supra,* 128 *N.J.* at 384, 608 *A.*2d 254: "Whatever flaws may have existed were not sudden, unexpected or emergent." Even the "death trap" in *Kolitch* was not regarded as an emergency that would necessitate the placement of warning signals. 100 *N.J.* at 497, 497 *A.*2d 183.

In the present case neither Pitman–Downer Road nor Mariner Drive was obstructed. If the overgrown shrubbery on private property created an obstacle, it was not one that would stop or catch drivers unaware. Rather, as the testimony from deposition witnesses indicated, any motorist attempting to traverse that intersection would have been aware of the blockage of visibility caused by the bushes. Stated differently, in the words of the statute, the dangerous condition "would ... be reasonably apparent to, and would ... have been anticipated by, a person exercising due care." This Court previously made that very point in the

context of a snowstorm. We stated that "the duty to warn addressed by *N.J.S.A.* 59:4–4, applied in the context of a snowstorm, concerns only extraordinary conditions that are qualitatively different from those conditions that would be 'reasonably apparent to' or 'anticipated by' a careful motorist driving in this snowstorm." *Rochinsky, supra,* 110 *N.J.* at 416, 541 *A.*2d 1029. Only such extraordinary and qualitatively different conditions can circumvent an immunity from liability otherwise specified by the Act. *Id.* at 416–17, 541 *A.*2d 1029. No conditions of that sort were present here, and therefore *N.J.S.A.* 59:4–4 does not apply.

Unfortunately, drivers do run stop signs. A reasonable driver does not rely on another driver obeying a stop sign. More importantly, the majority's reliance on a driver's knowledge of the missing sign leads to the totally illogical approach that the public entity's immunity depends on whether the driver is a native or a stranger to the area. Here, Trancucci was an out-of-town motorist. Presumably, if she had been driving Previte's truck and he had been driving her car, and the accident had occurred, his heirs could not recover from the public entity, because as an out-of-town motorist Trancucci could not have relied on the missing stop sign. Nothing could do more violence to the Legislature's intent that the public entity be immunized than the majority's test for determining liability, which rests solely on the *untestable* thoughts of the driver—who, in most cases, will be a party to the action.

## IV

The greatest failing, however, of the majority's holding that public entities may be liable for their failure to replace every missing stop sign *depending on what the driver allegedly knew* is the overwhelming burden it will place on public entities. The extraordinary burden that this circumvention of the Act will impose is evident from this record. First, the record contains no evidence that this intersection is unique or different from thousands of other intersections in New Jersey. As Steven Horwell, a traffic-maintenance supervisor for the County of Gloucester, point-

ed out, in late 1989 the Gloucester County road system contained more than ten-thousand stop signs. Of those ten-thousand signs, approximately two-to-three-thousand stood at intersections in which a county road intersected another county road, but the remainder stood at intersections between a county road and either a state road or a municipal road. Accordingly, Supervisor Howell pointed out: "You have to remember every ... municipal street that crosses, that's actually two signs. So there may only be five thousand municipal intersections on the county system['] plus each one involves two approaches." As *amicus curiae*, the Attorney General of New Jersey, points out, if Gloucester County, a rural county, has that many stop signs to maintain, one can only imagine the numbers of such signs in the urban and more populous counties. Moreover, under the Court's decision the same reasoning presumably would apply not only to stop signs but also to other traffic signs, such as yield signs.

In this case, the record contains evidence that the stop sign was down as often as on three separate occasions during the thirty days prior to the accident. Evidence also exists that the sign was down on multiple occasions prior to November 1989. Indeed, the police chief of Washington Township testified at his deposition that vandalism of traffic signs was a recurring problem within the Township. Under the majority's opinion, each time a stop sign is down, the municipality's failure to replace the sign subjects it to risk of liability for an accident at the corresponding intersection.

## V

To reach that convoluted result, the majority relies primarily on the California Tort Claims Act and its interpretation by a Professor Van Alstyne, not on the Act. Recently in *Weiss*, supra, in which we upheld the immunity of a public entity under *N.J.S.A.* 59:4-5, we specifically held that the California Tort Claims Act was not to be followed:

> On the issue of holding the public entity accountable for delay in effectuating the installation of the traffic signal, we take account of our analogous policy with

respect to the effect of the passage of time on plan or design immunity. Thus, although we often look to California for guidance in interpreting our Tort Claims Act we do not do so here.

[128 *N.J.* at 384–85, 608 *A.*2d 254 (citation omitted).]

Nor did we follow the California Tort Claims Act in *Kolitch, supra,* 100 *N.J.* at 496, 497 *A.*2d 183. The Appellate Division in *Kolitch* based its holding that the public entity was not immune on the theory set forth in *De La Rosa v. City of San Bernardino,* 16 *Cal.App.*3d 739, 94 *Cal.Rptr.* 175 (1971), that " 'although a public entity is not liable for failure to install traffic signs or signals . . ., when it undertakes to do so and invites public reliance upon them, it may be held liable for creating a dangerous condition in so doing.' " 193 *N.J.Super.* at 548, 475 *A.*2d 48 (quoting *De La Rosa, supra,* 94 *Cal.Rptr.* at 179). However, we reversed the Appellate Division judgment in *Kolitch.* 100 *N.J.* at 488, 497 *A.*2d 183. We were unpersuaded by the *De La Rose* theory in 1985 and I remain unpersuaded today.

The majority, however, has changed its opinion and today adopts the *De La Rosa* theory. Indeed, two of the early California cases on which Professor Van Alstyne relied as support for his interpretation of the California Tort Claims Act were likewise used by the *De La Rosa* court. As Judge Fritz stated in his dissent in *Kolitch* in the Appellate Division, "I believe that my colleagues have succumbed to the blandishments of hard facts and as a consequence have invaded the legislative province." 193 *N.J.Super.* at 549, 475 *A.*2d 48.

An examination of the pre-Act cases on which the majority relies also discloses that the majority misinterprets the holding of those cases, starting with *Hoy v. Capelli,* 48 *N.J.* 81, 222 *A.*2d 649 (1966), in which the Court held that the municipality was immune from liability. The comment to *N.J.S.A.* 59:4–5 cites *Hoy* and states: "This section is consistent with existing New Jersey law and to be contrasted with section (59:4–4)[,] which relates only to the use or failure to use *emergency* warning devices." In discussing the lower court's decision, the Court in *Hoy* recited the lower court's reasoning that the "sole traffic light at the intersection had

been completely removed for almost two months and there [was] not the slightest suggestion that either driver relied on the fact that it or any other traffic regulation device had existed." 48 *N.J.* at 86, 222 *A.*2d 649. Yet the holding in *Hoy* was that the municipality was immune, not because of the lack of reliance on the part of the drivers but because "[t]he decisions uniformly hold that a governmental determination to install or not to install traffic control devices cannot ground a cause of action." *Id.* at 91, 222 *A.*2d 649.

From the majority opinion one receives the erroneous impression that the Legislature meant to codify *Hoy's* statement concerning the lack of reliance on the part of the drivers in that case. That conclusion is wrong and misleading. The Comment to *N.J.S.A.* 59:4-5 cites *Hoy* for its holding—namely, that the municipality is not liable for failure to provide ordinary traffic signals. Indeed, the Comment's citation of *Hoy* bolsters the concept of municipal immunity, not liability, in these types of cases.

The majority's discussion of the Comment to *N.J.S.A.* 59:4-4 and its reference to *Bergen v. Koppenal,* 52 *N.J.* 478, 246 *A.*2d 442 (1968), is similarly misleading. The Comment to *N.J.S.A.* 59:4-4 states:

> This provision declares that liability may exist for the failure on the part of a public entity to provide an emergency warning signal or device when a condition exists constituting a "trap" to a person using a street or highway with due care. It should be noted, however, that a public entity's liability for failure to provide such signals or devices must be measured against the standard of whether the entity's action or inaction was "palpably unreasonable." *Bergen v. Koppenal,* 52 *N.J.* 478, 480, 246 *A.*2d 442 (1968).

The reliance on *Bergen* is meant to convey that liability for failure to provide *emergency* signals will exist only if the municipality's failure to provide such a signal is "palpably unreasonable." In fact, the Comment's citation to *Bergen* is merely a pinpoint citation to the phrase "palpably unreasonable."

The majority's opinion suggests that the Comment to *N.J.S.A.* 59:4-4 and its reference to *Bergen* means that the Legislature endorsed the *Bergen* decision. Because *Bergen* is an extremely

fact-specific case in which the Court issued a one-and-one-half page per curiam opinion that cited little law, I doubt that the Legislature's reference to it should be given such weight.

Furthermore, *Bergen* is easily distinguishable from the case now before the Court. *Bergen* involved a malfunctioning light that led motorists on both sides of the intersection to believe that they had the right of way because the light was green to both sides. 52 *N.J.* at 480, 246 *A.*2d 442. The issue was whether a police officer had the duty to assume traffic control of the intersection after he learned of the existence of the damaged traffic signals. The *Bergen* Court concluded that the officer might have a duty because he discovered a potentially dangerous condition that was not readily detectable by the motorists. *Ibid.*

In addition, the 1975 Law Division case that the majority cites as well as the 1979 Law Division case from which the Court derives its test for determining the meaning of an emergency situation or trap hold the municipality immune, not liable. See *Spin Co., supra,* 136 *N.J.Super.* at 520, 347 *A.*2d 20, and *Lytle v. Newark,* 166 *N.J.Super.* 191, 399 *A.*2d 333 (1979). In *Spin Co.,* the court relied on *Hoy* to hold the public entity immune for its failure to post a traffic signal to warn about an overpass because no emergency situation existed. 136 *N.J.Super.* at 525, 347 *A.*2d 20. In *Lytle,* the court distinguished *Bergen* and held the municipality immune for an accident that occurred at an intersection in which all the traffic lights were not functioning. The Court reasonably concluded that because the lights were not operating, "the intersection was like numerous other unregulated intersections and both plaintiff and the other driver were required to use due care in negotiating through it." 166 *N.J.Super.* at 195, 399 *A.*2d 333. Hence, *Lytle* held that the malfunctioning lights did not create an actionable dangerous condition because under the Tort Claims Act a " 'dangerous condition' becomes actionable only when the property is used with due care." *Id.* at 195, 399 *A.*2d 333. (quoting *N.J.S.A.* 59:4–1). However, the court distinguished the drivers in *Lytle* from the drivers in *Bergen* because like the

drivers in this case, the drivers in *Lytle* did not use due care. Therefore, like the drivers in *Lytle,* plaintiffs cannot maintain an actionable claim against the municipality.

The majority's citation of *Lytle* indicates only that the suit against the municipality there was dismissed because the court determined that the malfunctioning lights were not the proximate cause of the accident. See *ante* at 61, 648 *A.*2d at 710. That holding is only an *alternative* holding to its primary holding that no actionable dangerous condition existed.

The majority also relies on the recent Appellate Division case of *Eason v. New Jersey Automobile Full Insurance Underwriting Association,* 274 *N.J.Super.* 364, 644 *A.*2d 142 (1994). That reliance is misplaced for two reasons. One, although the Court claims that *Smith, supra,* 247 *N.J.Super.* 62, 588 *A.*2d 854, does not conflict with *Eason,* Judge Dreier (writing for the Appellate Division in *Eason* ) clearly thought that the two did conflict. See *Eason, supra,* 274 *N.J.Super.* at 372, 644 *A.*2d 142 ("Where we part with Smith is the extension of this immunity to the maintenance of the control after the decision has been fully implemented, and no policy decision has been made to remove the device."). Two, *Eason* itself rests on the mistaken assumption that the initial decision to place a stop sign at an intersection means that that intersection is dangerous. *See id.* at 374, 644 *A.*2d 142 ("The Township, with the State's concurrence, placed the stop sign at the intersection because *they recognized that the intersection was dangerous.*" (emphasis added)). The decision to place a stop sign cannot be synonymous with a declaration that the intersection controlled by that sign is *dangerous.* Moreover, if that conclusion were accepted, every stop-sign or traffic-light-controlled intersection would amount to a dangerous situation. To suggest that Gloucester County alone would have tens of thousands of emergency intersections is unthinkable.

## VI

The majority fails to follow the statutory mandate that "any immunity provisions provided in the act or by common law will

prevail over the liability." *N.J.S.A.* 59:2–1 comment. Nothing can be more evident than the statutory immunity contained in *N.J.S.A.* 59:4–5. That section operates as an absolute immunity to bar any suit against public entities for their failure to provide ordinary traffic signs, including stop signs. Because immunity under *N.J.S.A.* 59:4–5 so clearly applies, the majority's reliance on *N.J.S.A.* 59:4–4 is misplaced. It is misplaced not only because *N.J.S.A.* 59:4–4 is a liability provision but also because that provision refers only to "emergency warning signals." A stop sign is an ordinary regulatory sign, not an emergency warning signal. *Manual on Uniform Traffic Control Devices* at ¶ 2B–1 (1988).

The Court should not ignore the plain legislative policy underlying the Tort Claims Act and turn that underlying policy upside-down. Today, the Court attempts by a tortured route to find potential liability and elevates that potential liability over statutory immunity. Because of the statute's plain language, the Legislature's clear intent that the Tort Claims Act be construed strictly, and the burden today's decision will impose on public entities, I would affirm the judgment of the court below and hold that plaintiff's claim against the public-entity defendant is barred.

Our conclusion in *Weiss* bears repeating here: "The tragic circumstances of this case that so strongly counsel the departure from the provisions of the Act may commend a legislative response. In the absence of such a response, we cannot find a cause of action stated under the Tort Claims Act." 128 *N.J.* at 385, 608 *A.*2d 254.

Justice POLLOCK joins in this opinion.

*For vacating and remandment*—Chief Justice WILENTZ, and Justices HANDLER, O'HERN and STEIN—4.

*For affirmance*—Justices POLLOCK and GARIBALDI—2.